# CASES DECIDED

IN THE

# Supreme Court of Appeals

## OF VIRGINIA

### Staunton.

## ELKHART STATE BANK v. BRISTOL BROOM COMPANY.

September 17, 1925.

1. ATTACHMENT—*Motion to Abate an Attachment under Section 6403 of the Code of 1919—Statute Permissive Only—Postponement of Hearing antil Evidence is Introduced—Case at Bar.*—In the instant case there was a motion to abate an attachment under section 6403 of the Code of 1919, on the ground that the attachment was issued on false suggestion and without sufficient cause. The trial court postponed the hearing of the motion until after the evidence was introduced and then overruled it. This postponement of the hearing was assigned as error on the ground that the issue was jurisdictional to be tried by the court without reference to the merits.

   *Held:* That the provision of the statute is wholly permissive and not mandatory. There are cases where the litigation could be cut short and the case terminated without a jury trial by a preliminary motion of this kind, there are other cases, like the instant case, where the motion to quash necessitates a hearing of all the evidence on the merits—hence the permissive feature of the statute.

2. BILLS, NOTES AND CHECKS—*Bona Fide Holder—Question for Jury—Case at Bar.*—In the instant case, an attachment of a fund the proceeds of a draft, an intervener, a bank, claimed the fund as a *bona fide* holder of the draft. The draft was tainted with the grossest sort of fraud. The court instructed the jury that the question of whether the title to the draft remained in the drawer or passed to the bank, was for the jury, that if the jury believed that the bank received the draft as a deposit to be treated as cash and such was the parties intention at the time of the deposit the title of the draft passed to the bank, but if the jury believed that it was the intention of the parties that the draft should not be received as cash but only

by the bank as an agent for collection, then the title to the draft did not pass to the bank. It was in evidence that the drawer undertook to protect the bank.

*Held:* That the instruction was not without evidence to support it.

3. BILLS, NOTES AND CHECKS—*Fraud—Bona Fide Purchaser—Case at Bar.*—In the instant case, an attachment of the proceeds of a draft, it appeared that a gross fraud was perpetrated on the plaintiffs by the drawer of the draft; and, that while the case was apparently a suit between an intervener, a bank, and the plaintiffs, the intervener had been fully indemnified against loss by the drawer, and in substance the suit was between plaintiffs and the drawer which committed the fraud.

*Held:* That the circumstances attending the negotiation of the draft left the *bona fides* of the transaction sufficiently in doubt to carry the question to the jury which found against the intervener, notwithstanding its efforts to show that it was a *bona fide* holder for value without notice.

4. BILLS, NOTES AND CHECKS—*Fraud or Illegality in the Inception—Burden of Proof on Holder to Show Bona Fides.*—If the maker of a negotiable note, or other party primarily bound for its payment or bound by the original consideration, proves that it was obtained by fraud or illegality in its inception, or if the circumstances raise a strong suspicion of fraud or illegality, the holder of the note must show that he obtained it *bona fide* for value in the usual course of business, before maturity, and under circumstances which create no presumption that he knew of the facts which impeach its validity.

5. BILLS, NOTES AND CHECKS—*Fraud in the Inception—Bona Fide Holder—Transfer of Title—Exception to General Rule—Repurchase by Payee.*—Although negotiable paper originated in fraud, the *bona fide* holder thereof in due course takes it discharged of that defect, and, as a general rule, may negotiate it to another who had notice of the fraud, and the latter will acquire good title thereto free of the defect; but this rule is subject to the exception that if a payee sell negotiable paper to an innocent third party, and repurchases it, he does not thereby acquire any better title against the maker than he possessed in the first instance.

6. BILLS, NOTES AND CHECKS—*Proceeds of Draft—Right to Fund Stands no Higher than Right under the Draft—Case at Bar.*—In the instant case plaintiffs attached a fund in bank, the proceeds of a draft, against them. The draft was tainted with fraud. An intervener claimed the fund as a *bona fide* purchaser of the draft.

*Held:* That as the intervener's right and title was acquired through the medium of the draft, although all liability on the draft itself had been discharged, the right to the fund, which was the proceeds of the draft, could stand on no higher ground than if the action was on the draft itself.

7. BILLS, NOTES AND CHECKS—*Fraud—Repurchase—Payee Guaranteeing
     Payment to Holder of the Draft—Case at Bar.*—An intervener who
     claimed a fund, the proceeds of a draft tainted with fraud, as the
     purchaser thereof was the nominal holder only of the draft which
     was in fact for the benefit of the drawer, who had guaranteed to
     protect the intervener.
   *Held:* That the drawer had in effect, if not in fact, repurchased the
     draft or fund and the intervener could not recover the fund as against
     the defrauded drawees.

Error to a judgment of the Corporation Court of
the city of Bristol in a proceeding by attachment.
Judgment for plaintiffs.   Intervener assigns error.

*Affirmed.*

The opinion states the case.

*G. W. Cox, Thos. Curtain, Pennington, Price &
Jones* and *St. John & Gore,* for the plaintiffs in error.

*J. S. Ashworth* and *H. G. Lavinder,* for intervener in
error.

BURKS, J., delivered the opinion of the court.

This is an attachment suit by E. W. and E. C.
Whittaker, partners, doing business as Bristol Broom
Company, against Weymer Warehouse Company and
others, to recover the proceeds of a draft drawn by T.
Ralph Peck on the Broom Company, which had been paid
to the Dominion National Bank of Bristol, and which
was still held by it.   The Dominion National Bank
was made a defendant as garnishee.   The Elkhart
State Bank of Elkhart, Kan., intervened under the
provisions of section 6407 of the Code, and claimed
the fund.   There was a motion to abate the attachment
under section 6403 of the Code, on the ground that

the attachment was issued on false suggestion and without sufficient cause. The trial court postponed the hearing of this motion until after the evidence was introduced and then overruled it. The case proceeded to a hearing on the merits, when the jury found for the plaintiffs the full amount of their claim, and also that the draft above-mentioned was the property of the Weymer Warehouse Company, and not the property of the Elkhart State Bank. A motion was made by the Elkhart State Bank "to set aside the verdict of the jury and to award judgment in its favor." This motion the trial court overruled and set forth its reasons therefor as follows:

"Plaintiffs had contracted with T. Ralph Peck, of Wichita, Kansas, for a carload of broom corn, warranted to be of a certain quality. The shipment was made in the name of Peck from Elkhart, Kansas, consigned to his order, Bristol, Tenn., 'notify the Bristol Broom Company,' and the bill of lading was endorsed by him. The draft was drawn by him on Bristol Broom Company, payable to Elkhart State Bank of Kansas, hereinafter referred to as intervener. After paying the draft and procuring the bill of lading, plaintiffs immediately opened the car and found that the broom corn was worthless and that the amount paid was a total loss to them, and thereupon they sued out this attachment. It seems that the broom corn was in fact furnished by Weymer Warehouse Company of Elkhart, Kansas, whose main business was the buying and selling of broom corn, as it appears that this company 'received this draft in payment for' the shipment and 'turned the draft to the Elkhart State Bank' without endorsing it, which credited the amount thereof to the Weymer Warehouse Company with the right to check against it. Three or four days before the

draft was drawn or the shipment made, intervener, at the instance of B. F. Weymer, head of the Weymer Warehouse Company, wired Bank of Bristol: 'Will you pay demand draft approximately twenty-eight hundred dollars shipped by T. R. Peck for Bristol Broom Company?' To which the Bank of Bristol replied: 'Your wire fourth. Will honor draft Bristol Broom Company with bill of lading attached.' B. F. Weymer claims that his company sold the draft without recourse to Elkhart State Bank, but further says: 'We voluntarily after this trouble came up took it upon ourselves to protect the bank.'

"The Dominion National Bank, garnishee, through its vice-president, has answered both orally and in writing that it has the fund in hand, the amount of draft, $2,550.66.

"Intervener has filed a petition and also a motion in writing to quash the attachment, claiming the fund as an innocent holder for value. The jury, by their verdict, have found in favor of plaintiffs, and intervener moves that the verdict be set aside and that judgment be granted in its favor, the gist of the motion as made being in effect that the verdict is without evidence to support it.

"The Weymer Warehouse Company, through B. F. Weymer, has employed the lawyers, who are conducting the litigation in the name of Elkhart State Bank. The testimony of C. A. Williams, cashier of Elkhart State Bank, is not altogether free from contradiction. The foregoing are some, but not all, of the salient facts in evidence.

"Counsel for intervener rely confidently upon the case of *Fourth National Bank* v. *Bragg*, 127 Va. 47, 102 S. E. 649, 11 A. L. R. 1034. It is believed that the instructions as given stated the law as there declared

on the question whether intervener was a purchaser of the draft or an agent for collection. On this issue, in the light of the evidence as shown above and further disclosed by the record, the court is unable to hold that the verdict is without evidence to support it. The case referred to was unlike the case at bar in that the claim there asserted was the independent claim of a third party and no fraud in the inception was shown or attempted, and for this reason the instructions as given are believed to be liberal in favor of intervener. Although fraud in the inception was a dynamic fact in the case at bar, no instruction was asked by plaintiffs as to the legal effect thereof as to shifting the burden of proof. It was a fact, nevertheless, in favor of plaintiffs which was before the jury.

"Under the evidence, Peck sold the broom corn but Weymer Warehouse Company filled the order in his name with their goods. The draft and papers covering the shipment in the inception were tainted with the grossest sort of fraud, and this appearing, intervener is standing in their shoes by presumption at least. For the intervener to maintain the position which was upheld in *Fourth National Bank* v. *Bragg, supra,* in which case there was nothing to impute to the holder either bad faith or notice, the draft must have been credited as cash to the drawer, subject to check, and the transaction must have been 'in good faith and without notice.' *First Wis. Nat. Bank* v. *People's Nat. Bank,* 136 Va. 276, 283, 118 S. E. 82, 84 (36 A. L. R. 736).

"Where a party primarily bound for the payment of negotiable paper 'proves that it was obtained by fraud or illegality in its inception, or if the circumstances raise a strong suspicion of fraud or illegality, the holder of the note must show that he obtained it *bona fide*

in the usual course of business, before maturity, and under circumstances which create no presumption that he knew of the facts which impeached its validity.' This doctrine is now declared to be 'in accord' with section 59 of the negotiable instruments act, now section 5621 of the Code. *Duncan* v. *Carson*, 127 Va. 306, 321, 103 S. E. 665, 670.

"There is evidence that intervener took the draft for value, but as shown by the decision last above this alone is not sufficient. It must also show want of notice of the fraud. 'It has been expressly held that fraud in the inception of an instrument casts upon the holder the duty of proving the four conditions set forth in the law.' Note 18 A. L. R. 18, at page 48; Va. Code, sec. 5614.

"As shown, fraud in the inception is both proven and admitted in this case. This threw upon intervener the burden of showing that it was in fact a holder in due course as defined by law. (Va. Code, sec. 5614.) This it attempted in a way to do by the testimony of its cashier, Williams, and that of B. F. Weymer, a participant in the fraud. 'The credibility of this testimony, though undisputed, was for the jury. *Joy* v. *Diefendorf*, 130 N. Y. 6, 28 N. E. 602, 27 Am. St. Rep. 484.' *Duncan* v. *Carson*, 127 Va. 306, 322, 103 S. E. 665, 670.

"Under similar evidence a verdict against an intervener was upheld in *Greenburg National Bank* v. *Syer*, 113 Va. 53, 73 S. E. 438.

"The motion of intervener to set aside the verdict of the jury and to award judgment in its favor is denied."

[1] It is assigned as error that the court postponed the hearing of the motion to quash. It is said that "this issue was *jurisdictional* and is raised before the

court and tried by the court without reference to the merits of the case. If the court is of opinion that it issued on false suggestion, the action is dismissed for want of jurisdiction."

The provision of the statute is wholly permissive and not mandatory.[1] There are cases where the litigation could be cut short and the case terminated without a jury trial by a preliminary motion of this kind; for example, if the only question involved were whether the principal defendant was a nonresident. There are other cases, like the instant case, where the motion to quash necessitated the hearing of all the evidence on the merits of the case. Hence, the permissive feature of the statute. The trial court committed no error in postponing the hearing of the motion to quash.

---

[1]"Sec. 6403. What defense may be made to attachments.—Any defendant may show that the court is without jurisdiction to hear and determine the controversy.

"The principal defendant, if not served with process, may appear specially and show that the attachment was issued on false suggestion or without sufficient cause, in which event the attachment shall be quashed.

"Any person claiming title to, an interest in, or a lien upon the property attached, or any part thereof, after being admitted as a party defendant, if not already a defendant, and the principal defendant, may contest the liability of the principal defendant for the petitioner's claim, in whole or in part, by proof of any matter which would constitute a good defense by the principal defendant to an action at law on such claim, and may also show that the attachment was issued on false suggestion, or without sufficient cause. The principal defendant may also file set-offs as in an action at law.

"Other defendants shall be limited to defenses personal to themselves, or which may prevent a liability upon them or their property.

"The court in which an attachment is pending, or the judge of such court in vacation, may, either before or at any time after an attachment has been returned, on motion of the principal defendant, or any defendant claiming title to, an interest in, or a lien upon the property attached, or any part thereof, after reasonable notice to the attaching creditor, hear testimony and quash the attachment, if of opinion that the attachment is invalid on its face, or was issued on false suggestion, or without sufficient cause. When the attachment is properly sued out, and the case is heard upon its merits, if the court be of opinion that the claim of the plaintiff is not established, final judgment shall be given for the defendant. In either case, he shall recover his costs, and there shall be an order for the restoration of the attached effects."

[2] It is assigned as error that the trial court gave an instruction for the plaintiffs which there was no evidence to support. This is sufficiently disposed of in the opinion of the trial court hereinbefore quoted.

[3, 4] It is further assigned as error that the verdict of the jury is contrary to the law and the evidence. The evidence is summarized in the opinion of the trial court hereinbefore set forth. From this it appears that a gross fraud was perpetrated on the plaintiffs by the Weymer Warehouse Company, and that, while this is apparently a suit between the State Bank of Elkhart and the plaintiffs, that bank has been fully indemnified against loss, if it has not actually been repaid, and in fact and in substance the suit is between the plaintiffs and Weymer Warehouse Company, which committed the fraud; that the plaintiffs have received nothing for the $2,550.66 paid out by them; that if the judgment of the trial court be affirmed the plaintiffs will get back their money and the loss will be thrown upon the Weymer Warehouse Company, which committed the fraud; but if it be reversed, the plaintiffs will lose their $2,550.66, and the Weymer Warehouse Company will reap the benefits of its fraud. In neither case will the State Bank of Elkhart suffer any loss. Under these circumstances, what judgment should be rendered by this court?

In *Piedmont Bank* v. *Hatcher*, 94 Va. 229, 26 S. E. 505, it was held that "if the maker of a negotiable note, or other party primarily bound for its payment, or bound by the original consideration, proves that it was obtained by fraud or illegality in its inception, or if the circumstances raise a strong suspicion of fraud or illegality, the holder of the note must show that he obtained it *bona fide* for value in the usual course of business, before maturity, and under circumstances

which create no presumption that he knew of the facts which impeach its validity."

This is in accord with section 59 of the negotiable instruments act, now section 5621 of the Code, since enacted. Apparently, the State Bank of Elkhart attempted to carry this burden, but the circumstances attending the negotiation of the draft left the *bona fides* of the transaction sufficiently in doubt to carry the question to the jury which found against the bank.

[5] Although negotiable paper originated in fraud, the *bona fide* holder thereof in due course takes it discharged of that defect, and, as a general rule, may negotiate it to another who had notice of the fraud and the latter will acquire good title thereto free of the defect. Such *bona fide* holder has the world as a market, as a general rule. But to this general rule there is an exception.

In *Aragon Coffee Co.* v. *Rogers*, 105 Va. 51, 52 S. E. 843, 8 Ann. Cas. 623, it was held: "As a general rule the holder for value and without notice of a negotiable note acquired before maturity can transmit a complete title to a third person, even though the latter has knowledge of facts which would have defeated a recovery upon the note in the hands of the payee; but this rule is subject to the exception that if a payee sell negotiable paper to an innocent third party, and repurchases it, he does not thereby acquire any better title against the maker than he possessed in the first instance."

[6, 7] In the instant case, the right and title to the fund in the hands of the Dominion National Bank was acquired through the medium of the draft aforesaid, and although all liability on the draft itself has been discharged, the right to the fund which is the proceeds of the draft can stand on no higher footing than

if this had been an action on the draft by the State Bank of Elkhart. So treating it, we find the State Bank of Elkhart is the nominal holder only of the draft and the nominal plaintiff in the suit, which is in fact for the benefit of the Weymer Warehouse Company. In other words, the Weymer Warehouse Company has in effect, if not in fact, repurchased the draft or fund, and it is now subject to the attachment of the plaintiffs.

The bank had no right to charge the amount of the draft to the account of the Weymer Warehouse Company, as is usually the case. According to the testimony, it bought the draft at its face value and without recourse, and when the Weymer Warehouse Company thereafter assumed or guaranteed its payment, it in effect repurchased the draft.

We find no error in the judgment of the trial court and it is affirmed.

*Affirmed.*